# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 15 2017, 7:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David L. Joley
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of the Termination of the Parent-Child Relationship of S.N. (Minor Child)

and

J.F. (Father),
*Appellant-Respondent,*

v.

Indiana Department of Child Services,

March 15, 2017

Court of Appeals Case No.
02A05-1610-JT-2361

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge
The Honorable Sherry A. Hartzler, Magistrate

Trial Court Cause No.
02D08-1610-JT-23

*Appellee-Petitioner.*

**Bradford, Judge.**

# Case Summary

Appellant-Respondent J.F. ("Father") appeals the juvenile court's order terminating his parental rights to S.N. (the "Child"). On February 24, 2015, Appellee-Petitioner the Indiana Department of Child Services ("DCS") filed a petition alleging that the Child was a child in need of services ("CHINS"). Following an evidentiary hearing, the Child was adjudicated to be a CHINS. Father, who was incarcerated at the time of the CHINS hearing, was ordered to establish paternity and participate in certain services. Father was also ordered to notify DCS upon his release from incarceration so as to complete an evaluation to determine what other services might be necessary. Although Father established his paternity of the Child, he failed to complete the court-ordered services or to notify DCS upon his release from incarceration.

DCS filed a petition seeking the termination of Father's parental rights to the Child on January 29, 2016. Following an evidentiary hearing, the juvenile

court issued an order granting DCS's petition. On appeal, Father contends that DCS did not provide sufficient evidence to support the termination of his parental rights. We affirm.

## Facts and Procedural History

Father and K.D. ("Mother") are the parents of the Child who was born on May 18, 2010.[1] DCS became involved with the Child in February of 2015 after Mother's other child was diagnosed with shaken baby syndrome.[2] As a result of the other child's diagnosis, both Mother's other child and the Child were subsequently removed from Mother's care. At the time, Father was incarcerated in the Department of Correction ("DOC").[3]

During a March 23, 2015 hearing, Father admitted that he was the alleged father of the Child and that due to his incarceration, he was "unable to provide care, supervision or financial support for [the Child]." DCS Ex. 6, p. 2. Following the conclusion of this hearing, the juvenile court found the Child to

---

[1] The termination of Mother's parental rights to the Child is not at issue in the instant appeal. As such, to the extent possible, we will limit our factual overview and discussion to facts and issues pertaining to Father.

[2] This other child's father, who lived with Mother and the Child, was subsequently convicted of Level 3 felony neglect of a dependent for actions which were found to have caused the other child's condition.

[3] At this time, Father's release date was believed to be in 2021.

be a CHINS. In a subsequent dispositional order, the juvenile court ordered that Father shall:

1. Refrain from all criminal activity;

2. Maintain clean, safe, and appropriate sustainable housing at all times;

3. Notify the [DCS] within forty-eight (48) hours of all changes in household composition, housing, and employment;

4. Cooperate with all caseworkers, and the Guardian ad Litem [("GAL")] or [Court Appointed Special Advocate ("CASA")];

5. Attend all case conferences as directed; maintain contact with [DCS], and accept announced and unannounced home visits by all caseworkers, the [GAL] or CASA;

6. Immediately provide the caseworkers with accurate information regarding paternity, finances, insurance, and family history including the names and address of the [Child's] father or alleged father;

7. Immediately provide the caseworkers and [GAL]/CASA with signed and current consents of release and exchange of information;

8. Provide the [Child] with clean, appropriate clothing at all times and;

9. Fully cooperate with all rules of the [Child's] placement.

In addition, you shall successfully complete and benefit from the following programs, services and/or other requirements in a timely manner:

10.  Commence proceedings to establish paternity by meeting with the IV-D Prosecutor and fully cooperate with the IV-D staff to establish paternity for [the Child].

DCS Ex. 7.  Father was also ordered to notify DCS upon his release from incarceration.  Father's paternity was established in an order dated July 14, 2015.

[5]  On January 29, 2016, DCS filed a petition seeking the termination of Father's parental rights to the Child.  The juvenile court conducted an evidentiary hearing on DCS's petition on June 22, 2016.  Father failed to appear for this hearing but was represented by counsel.

[6]  During the termination hearing, DCS presented evidence indicating that Father had a "long criminal history" which was largely related to substance abuse.  Tr. p. 35.  Father's criminal history includes a conviction for dealing in methamphetamine, multiple convictions for possession of methamphetamine, and multiple convictions for possession of paraphernalia.  It also includes "a long history of OWIs, other possession cases, [and] other cases of public intox."  Tr. p. 77.  Father also had a "very long history of substance use and abuse."  Tr. p. 77.

[7]  DCS also presented evidence indicating that Father was released from incarceration and placed in the Allen County Community Corrections program on April 18, 2016.  Father, however, did not notify DCS of his release as previously ordered.  In addition, Father has failed to provide DCS with an address where DCS could reach him.

[8] Further, as part of his Community Corrections placement, Father was required, among other things, to obtain a job, follow the drug screening policy, and meet with his case manager, Bobbie Guin. As of the date of the termination hearing, Father had admitted to Guin that he had used methamphetamine on more than one occasion since being released from incarceration. He also had multiple positive drug screens and had failed to submit to other drug screens. In light of Father's violations of the terms of his Community Corrections placement, Father had already appeared before the Community Corrections hearing board and received a "therapeutic sanction." Tr. p. 26. As a result, Father was required to attend certain "meetings" and to provide Guin with a letter indicating "what he learned in those meetings." Tr. p. 26.

[9] Guin also informed the juvenile court that Father had another hearing scheduled before the Community Corrections hearing board later that same day. The purpose of the hearing was to address Father's missed drug screens as well as the fact that he had failed to provide the above-mentioned letter as previously ordered. Guin acknowledged that a possible outcome of this hearing was that Father's placement on Community Corrections would be revoked and he would be sent back to DOC. Further, if Father was sent back to DOC, it would be up to DOC to determine how much additional time Father would be required to serve.

[10] In addition, DCS presented evidence indicating that prior to DCS's involvement, Father had only seen the Child "one time when she was a very small infant." Tr. p. 72. Father had not had any contact with the Child during

the CHINS or termination proceedings. He had never requested any visits with the Child or provided any letters or cards for DCS to pass along to the Child. Further, although Father has stated that he eventually wants to be in the Child's life, he has admitted to Guin that "right now he doesn't feel that he's in a place to be in" the Child's life. Tr. p. 34.

[11] Following the conclusion of the hearing, the juvenile court took the matter under advisement. On September 13, 2016, the juvenile court issued an order terminating Father's parental rights to the Child. This appeal follows.

# Discussion and Decision

[12] On appeal, Father contends that the evidence is insufficient to sustain the termination of his parental rights to the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

Father contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating his parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the

juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

[16] In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A)  one (1) of the following exists:

(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

(ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B)  that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a

threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Father does not dispute that DCS presented sufficient evidence to support the first and fourth elements set forth in Indiana Code section 31-35-2-4(b). Father, however, claims that DCS failed to establish the second and third elements that are required to be proven before a court can order the involuntary termination of a parent's parental rights.

## A. Whether Conditions Will Be Remedied

On appeal, Father argues that DCS failed to establish by clear and convincing evidence both that the conditions leading to the Child's removal from his home would not be remedied and that there is a reasonable probability that the continuation of the parent-child poses a threat to the well-being of the Child.

It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find *either* that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, *or* (3) the child has been adjudicated CHINS on two separate occasions. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003),

*trans. denied.* Therefore, where the juvenile court determines one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile court to find, either of the other two factors listed in Indiana Code section 31-34-2-4(b)(2)(B). *See generally In re S.P.H.*, 806 N.E.2d at 882 (providing that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only prove and the juvenile court need only find that one of the factors listed in that sub-section is true).

[19] In order to determine whether the conditions will be remedied, the juvenile court should first determine what conditions led DCS to place the Child outside of Father's care or to continue the Child's placement outside Father's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*; *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying the child's removal or continued placement outside their parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of

adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)). The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[20] Here, the juvenile court determined that DCS presented sufficient evidence to prove that it was unlikely that the reasons for the Child's removal from and continued placement outside of Father's care would be remedied, and upon review, we conclude that the juvenile court's determination to this effect is supported by the record. In support of its determination, the juvenile court found as follows:

> 2. The Child, [S.N.], was born to the Respondent Mother, [K.D.] on May 18, 2010.
>
> 3. Respondent Father, [J.F.], has been adjudicated the father of [the Child] on July 14, 2015 under cause number 02D07-1504-JP-286.
>
> ****
>
> 14. The Court finds that proof of service is and notice is shown upon [Father]. (Exhibit 28, Order dated February 29, 2016).

15. On February 24, 2015, [DCS] filed a Verified Petition Alleging [the] Child to be in Need of Services.

16. A Preliminary Inquiry and Initial Hearing was held in the underlying [CHINS] case 02D08-l502-JC-82 on February 24, 2015 at which time the child was placed in home of relatives.

17. On March 17, 2015, [the Child] was placed in licensed foster care.

18. On March 20, 2015, [DCS] filed an Amended Verified Petition Alleging [the] Child to be in Need of Services, and on March 23, 2015 an Additional Initial hearing was held at which [Father] admitted that he was the "alleged father of [the Child"] and that due to his incarceration at Westville Correctional Facility, [Father] is unable to provide care, supervision or financial support for [the Child]. On March 20, 2015, the Court adjudicated [the Child] a [CHINS] under I.C. 31-34-1-1 and I.C. 31-34-1-2.

19. On March 23, 2015 a Dispositional Hearing was held and the [Child was] ordered continued in licensed foster care. [Father] was ordered to, among other things, contact [DCS] within 48 hours of any changes in housing, household composition or employment. Additionally, he was ordered establish paternity.

20. On August 19, 2015, a Review Hearing was held and the child remained in licensed foster care.

21. On December 1, 2015, a Permanency Hearing was held in which the Court approved a plan for termination of parental rights and ordered [that] the [C]hild remain in licensed foster care.

22. On March 1, 2016, a Review Hearing was held in which it was ordered that the [C]hild remain in licensed foster care.

23. In the present underlying CHINS case, [The Child] has been placed outside the care of [Father] for a period of more than six (6) months since the entry of the Disposition Decree.

24. [The Child] was removed from the care of her parents due to neglect and the failure to provide appropriate care and supervision.

25. Over the course of the underlying [CHINS] proceedings [Father has not] contributed to the care and support of the [C]hild nor has he provided financial or material benefits for the care and support of the [C]hild.

26. Over the course of the underlying [CHINS] proceedings [Father] has not maintained contact or visitation with [the Child] or availed himself of these proceedings or services to remedy the reason for the removal of [the C]hild and the continued placement outside of his care.

27. [Father] was incarcerated for a majority of the underlying juvenile proceedings for a felony conviction for possession of Methamphetamines. Although it was order[ed] that he contact [DCS] upon his release, he failed to do so.

28. It was further requested [that Father] provide [DCS] with information concerning any services he may have completed or participated in at [DOC] and he failed to do so.

29. The Court finds that although [Father was] released from [DOC] in approximately April of 2016, he is under the supervision of Community Corrections.

30. The Court finds that [Father] has not been in compliance with the terms of his release as he has continued to use and test positive for illegal substances.

31. The Court finds that as of the date of the termination proceedings, [Father] was scheduled to appear before the hearing board to determine whether his release would be revoked and he would be incarcerated at [DOC]. The Court finds that that is the second hearing in which [Father]'s noncompliance with the terms of his release have been addressed.

32. The Court finds that [DCS] has attempted to make contact with [Father] through his Community Corrections Case manager, Bobb[ie] Guin. The Court finds that contact information for [DCS] was provided to [Father] but he failed to follow through with contacting his [DCS] case manager.

33. The Court finds that [Father] had discussed his circumstances with Bobb[ie] Guin of Community Corrections and admitted that he was struggling with the use of methamphetamines and that he was not currently in a stable position to provide care and supervision for [the C]hild.

34. The Court further finds that [Father] has other children who are not in his care and it is alleged that he has "signed over his rights" to three other children.

Appellant's App. Vol. II, pp. 54-57. In light of these findings, the juvenile court concluded that DCS had established by clear and convincing evidence that the reasons for the Child's removal from and continued placement outside Father's home would not be remedied. In reaching this conclusion, the juvenile court noted that Father "has not availed himself of these proceedings and services." Appellant's App. Vol. II, p. 58.

[21] We note that in claiming that the evidence was insufficient to support the juvenile court's order terminating his parental rights, Father does not challenge

the sufficiency of any particular finding, instead levying only the blanket assertion that the juvenile court's conclusion was not supported by the evidence. As a result, Father has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (providing that when an appealing party fails to challenge the findings of the trial court, the findings must be accepted as correct); *In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenges findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied*.

[22] On appeal, Father asserts that the juvenile court failed to consider evidence indicating that he has acknowledged his substance abuse issues and has professed an interest in being a presence in the Child's life. Father argues that as of the date of the termination hearing, he had only been released from prison for approximately two months and asserts that he was not offered the opportunity to participate in services while incarcerated. Father, however, does not provide any indication as to why he failed to attempt to begin services or initiate visitation with the Child after being released from incarceration.

[23] Father also asserts that the juvenile court failed to consider evidence indicating that he was attempting to make positive changes in his life. Father, however, has failed to demonstrate what these alleged positive changes are. At the time of the termination hearing, the evidence established that Father continued to use and abuse illegal drugs and was facing revocation of his Community Corrections placement. Father acknowledged the potential that his placement

would be revoked and that he would be returned to incarceration in DOC, arguing that if returned to DOC, he would likely be released from incarceration by October of 2016.[4] Even though Father admits that he was not in a position to provide care for the Child as of the date of the termination hearing, Father's assertion in this regard appears to be that the juvenile court should have given Father additional time to attempt to make positive changes in his life before terminating his parental rights to S.N.

[24] It is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Father. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Father's challenge to the sufficiency of the evidence to support the conclusions of the juvenile court effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[25] Upon review, we conclude that the juvenile court did not err in concluding that the conditions leading to the Child's removal from and continued placement outside's Father's care were unlikely to be remedied. *See In re C.M.*, 675 N.E.2d

---

[4] Given that the amount of any additional time served by Father would be determined by the DOC, the juvenile court was not obligated to credit Father's claim that he would be released in October of 2016.

1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the parent-child relationship poses a threat to the Child's well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

## B. Best Interests of the Child

[26] We are mindful that in considering whether termination of one's parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id*. Furthermore, this court has previously determined that the testimony of the case worker, a GAL, or a CASA regarding the child's need for permanency supports a finding that termination is in the child's best interests. *Id*.; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[27] Here, the juvenile court found that evidence established that the Child has a need for permanency and stability and that the termination of Father's parental rights would serve the Child's best interests. In addition to the findings set forth above, the juvenile court found as follows:

> 35. The Court finds that [the Child] is currently placed in a pre-adoptive placement. Since her removal, [the Child] has had behavioral issues that have improved over the course of her

removal from her parents. [The Child] requires stability and care and the continued provision of therapy.

36. Should parental rights be terminated [DCS] has an appropriate plan for [the Child], that being adoption.

37. The [C]hild's [CASA] has also recommended termination of parental rights and that the [Child]'s best interests are served by the termination of parental rights.

Appellant's App. Vol. II, p. 57. In light of these findings, the juvenile court concluded that DCS had established by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interests. In reaching this conclusion, the juvenile court noted that the Child "need[s] a safe[,] stable and nurturing home environment that can be achieved through adoption." Appellant's App. Vol. II, p. 58.

[28] Again, the record reveals that Father took no action to attempt to begin services or visitation with the Child upon his release from incarceration. Notably, although represented by counsel, Father did not even appear before the juvenile court for the termination hearing. The record reveals that Father has only seen the Child once—when the Child was a "very small infant," tr. p. 72, and his actions are not consistent with his claim that he would like to be a part of the Child's life. In addition, Father does not dispute the juvenile court's determination that the Child requires stability.

[29] Family Case Manager ("FCM") Patricia Parrish, the case manager assigned to the Child's case, testified that she believed that the termination of Father's

parental rights was in the Child's best interests. In explaining her recommendation, FCM Parrish indicated the following:

> [The Child] ah is placed in a pre-adoptive home [with care givers] who have addressed some issues with her[. S]he had some behavioral issues and they have pulled every service that they could pull in to work with [the Child] um she's a part of their family she goes on vacations with them, um she's doing cheerleading with her foster siblings she they have just welcomed her into their home and [the Child] really needed some one-on-one attention that she's now receiving um and she's a completely different kids [sic] it's almost hard to explain. Her behaviors were off the charts[, …] she was hitting other kids with baseball bats and fighting and biting and carrying on and now she's been placed in a pre-adoptive home where the focus is on [her] and and she's had them um these siblings working with her and she's now able to attend preschool; starting kindergarten in the fall. These are things that a year ago[, …] the preschools were saying we don't want her if she's going to behave this way. She's a completely different child. Um she continues to be involved in individual therapy through Phoenix um they have worked so well with her.

Tr. pp. 65-66. FCM Parrish further indicated that the Child was progressing very well in her current situation and that she was "very unstable prior to this." Tr. p. 66.

[30] In addition, both the Child's CASA, Suzanne Lange, and GAL, Beth Webber, expressed the following concerns in relation to Father: Father's (1) incarceration throughout the majority of the CHINS case; (2) extensive criminal history; (3) history of drug abuse/ongoing drug use; (4) failure to contact DCS upon his release from incarceration; (5) lack of relationship with

the Child, even before DCS became involved; and (6) lack of stability and ability to care for the Child's special needs. In light of these concerns coupled with the likelihood that Father would return to prison because of his continued drug use, the Child's CASA testified that she believed that the termination of Father's parental rights was in the Child's best interests. Also in light of the above-stated concerns coupled with the Child's progress and Father's apparent lack of interest in the Child's life, the Child's GAL testified that she believed that termination of Father's parental rights was in the Child's best interests.

[31] The juvenile court did not have to wait until the Child was irreversibly harmed such that her physical, mental, and social development was permanently impaired before terminating Father's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of FCM Parrish, CASA Lange, and GAL Webber, considered with the juvenile court's unchallenged factual findings and Father's failure to contact DCS following his release from incarceration, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Father's parental rights is in the Child's best interests. Again, Father's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

# Conclusion

[32] Having concluded that the evidence is sufficient to support the juvenile court's order terminating Father's parental rights to the Child, we affirm the judgment of the juvenile court.

[33] The judgment of the juvenile court is affirmed.

Vaidik, C.J., and Brown, J., concur.